## AFFIDAVIT OF SPECIAL AGENT JAMES KECZKEMETHY

I, James Keczkemethy, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, depose and state as follows:

## INTRODUCTION

1.      I am a Special Agent of the DEA and have been so employed since October 2017. As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I am also a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. Prior to my employment with DEA, I was a police officer in Hartford, Connecticut, for more than six years and was responsible for enforcing State of Connecticut motor vehicle and criminal laws, including narcotic violations.

2.      During my law enforcement career, I have participated in numerous investigations and arrests involving violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1) and 846.  Many of those investigations resulted in arrests, indictments, and convictions for violations of drug laws and/or other criminal offenses, the seizure of drugs, money, and vehicles, and the forfeiture of personal property. My investigations have included the use of surveillance techniques, tracking warrants, and the execution of search, seizure, and arrest warrants. I have participated in various aspects of narcotics investigations, including controlled and undercover purchases. Based on my training and experience, I am familiar with the appearance, packaging, and texture of many controlled substances, including fentanyl, cocaine base, and others.

3.      During my career in law enforcement, I have received training and gained experience related to a variety of criminal activities. In the course of my training and experience,

I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds and the organization of drug trafficking conspiracies. I have participated in all aspects of drug investigations, including Title III wiretaps, physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

4.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which narcotics traffickers use coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of telephone calls to avoid speaking over the telephone. I am familiar with the "street"

language used by drug traffickers, as well as the methods they use to disguise conversation and operations.

5.      I have participated in the below-described investigation since July 2018. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources including, but not limited to, the following:

    a.  My training and experience investigating drug-trafficking and money-laundering crimes;

    b.  Oral reports, written reports, and documents that I have received from DEA and other federal, state, and local law enforcement agents;

    c.  Physical and electronic surveillance conducted by me and other federal, state, and local law enforcement officers;

    d.  Confidential sources of information;

    e.  Public records;

    f.  Business records;

    g.  Telephone toll records, pen register and trap and trace information, and telephone subscriber information;

    h.  Controlled purchases of narcotics;

    i.  Evidence obtained from consensually-recorded wire and electronic communications;

    j.  Queries of law enforcement records and intelligence databases;

    k.  Execution of search warrants and tracking warrants; and

    l.  Arrests of co-conspirators; and

    m.  Evidence obtained from judicially-authorized intercepted communications over Target Telephones (as described below).

## PURPOSE OF AFFIDAVIT

6.      I am submitting this affidavit in support of:

a.   An application for the issuance of a search warrant authorizing the search of 22 Chardon Street, First Floor, Lawrence, Massachusetts and all common areas including the basement (hereinafter, the "Target Location"). The Target Location is the first floor of a two-family residence. The building has tan siding and a white front door. The Target Location is accessed by a front door with a window to the left of the front door. Investigators have executed a prior unrelated search warrant at the Target Location on June 27, 2019. I am familiar with the layout of the Target Location from that prior search. I am familiar that the Target Location has access to common areas of the building, including the basement. A complete description of the property to be searched is set forth in Attachment A, which is attached hereto and incorporated herein;

b.   An application for the issuance of a criminal complaint charging Justin SURIEL, a/k/a "Chachi," with conspiracy to distribute and possess with intent to distribute fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 846.

7.      As further discussed below, there is probable cause to believe that Justin SURIEL ("SURIEL") has engaged in a conspiracy to distribute and possess with intent to distribute fentanyl; and (b) that SURIEL keeps evidence of his drug distribution activities at the Target Location. As recently as May 12, 2021, investigators have observed SURIEL at the Target Location.

8.      As a result, I submit that there is probable cause to believe that the Target Location (which I believe is SURIEL's residence) contains records and other evidence of the following

4

offenses:  (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); (c) conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; and (d) money laundering offenses, in violation of 18 U.S.C. §§ 1956, 1957 (collectively, the "Target Offenses").  More specifically, as will be discussed below, I submit that there is probable cause to believe that within the Target Location there is evidence of the Target Offenses, as described in Attachment B.

9.      Because this affidavit is submitted for the limited purpose of establishing probable cause that evidence of criminal activity involving the Target Offenses is located at the Target Location and that SURIEL has conspired to distribute and possess with intent to distribute fentanyl, I have not included each and every fact known to me or other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are sufficient to establish probable cause for the issuance of the requested search warrant and complaint.  All times herein are approximate.

## SUMMARY OF INVESTIGATION

### A. Background of the Investigation

12.      Beginning in May 2018, DEA investigators were investigating a drug trafficking organization (hereinafter, the "FLACO DTO") that advertised the sale of narcotics by telephone. The FLACO DTO used various telephone numbers as its customer telephone number (hereinafter, the "Customer Telephone Number"), and has intermittently changed its Customer Telephone Number since the start of this investigation.  The Customer Telephone Number was used by

customers of the FLACO DTO to place orders for a variety drugs, including cocaine, cocaine base, and fentanyl.

13.     During the investigation, the FLACO DTO changed the Customer Telephone Number numerous times.  Based on the investigation, whenever the FLACO DTO changed its Customer Telephone Number, the FLACO DTO sent a text message from the new Customer Telephone Number to drug customers informing them of the new telephone number for placing drug orders and advertising the sale of illicit drugs.  For example, on March 10, 2020, at 4:20 p.m., a confidential informant ("CS-1") received a text message from telephone number (978) 376-8310, believed to be a new Customer Telephone Number, which stated:  "Iam goku new Number got ultimate best quality guaranteed around brown, white, hard white, e pill, and [sic].  Delivery everywhere."  Based on the investigation, I believe that this introductory text message from the FLACO DTO advertised the sale of heroin and/or fentanyl, cocaine, crack cocaine, and ecstasy pills ("brown, white, hard white, e pill," respectively).  During the investigation, similar text messages were received by an undercover telephone used by a DEA investigator conducting undercover purchases from the FLACO DTO.  During the investigation, the FLACO DTO used at least four different monikers to advertise the sale of narcotics, including "Flaco," "Peter," "Goku," and "Vegueta."  Based upon the diction in the telephone conversations, and manner and means of operation, I believe that all of these monikers were used by the FLACO DTO.  Based upon my training and experience, I know that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change telephone numbers and nicknames in an effort to thwart law enforcement's use of electronic surveillance.

14.     Since May 2018, investigators have conducted numerous undercover purchases of narcotics from the FLACO DTO. After negotiating the quantity of fentanyl and purchase price,

FLACO directed the undercover law enforcement officer (the "UC") to various locations in Lawrence, Lowell, Methuen, and Haverhill (the "Merrimack Valley region") in Massachusetts and arranged for a drug courier to meet the UC to complete the drug transaction. After conducting controlled purchases from May 3, 2018, to February 11, 2019, a number of drug couriers and stash house operators working for the FLACO DTO were arrested and indicted, and some have been sentenced, all in the District of Massachusetts. *See United States v. Jose Hernandez*, *et al.,* 18-CR-10348-LTS; *United States v. Antonio Camillo*, 19-CR-10024-DJC; and *United States v. Jesus Rojas*, 19-CR-10112-LTS.  Drug analysis reports from the controlled purchases confirmed the presence of fentanyl and/or cocaine base, depending on which substance was ordered.

15.     As discussed below, investigators identified SURIEL as a courier for the FLACO DTO, working at the direction of Anny CRUZ, a/k/a "Mattie," (a manager for the FLACO DTO) and Jorge Luis DIAZ, a/k/a "Cosita," (the leader of the FLACO DTO). SURIEL was working with another courier, Nathaniel INFANTE, a/k/a "NATI." On two occasions, agents conducted controlled purchases of fentanyl from INFANTE. On December 14, 2020, the Honorable Marianne B. Bowler issued search warrants for CRUZ and INFANTE's residences, as well as stash locations for the FLACO DTO, which resulted in the seizure of cellular telephones and narcotics. *See* 20-mj-2624-2632-MBB. On February 24, 2021, members of the FLACO DTO, including CRUZ, DIAZ, and INFANTE, were indicted by a federal grand jury. *See United States v. Anny Cruz, et. al.*, 21-CR-10071-PBS. SURIEL was not included in that indictment.

**B.  Title III Electronic Surveillance**

16.     On July 6, 2020, the Honorable Patti B. Saris, United States District Court Judge, District of Massachusetts, signed an Order authorizing the initial interception of wire and electronic communications to and from (917) 325-2975 ("Target Telephone 1"), used by CRUZ.

17.     On August 19, 2020, the Honorable Denise J. Casper, United States District Court Judge, District of Massachusetts, signed an Order authorizing the initial interception of wire and electronic communications to and from (646) 348-4879 ("Target Telephone 2"), used by CRUZ; and other telephones connected to this investigation.

18.     On December 1, 2020, the Honorable Patti B. Saris, United States District Court Judge, District of Massachusetts, signed an Order authorizing the initial and/or continued interception of wire and/or electronic communications to and from (617) 515-9539 ("Target Telephone 9"), used by CRUZ, and other telephones connected to this investigation.

19.     From July 2020 to December 2020, SURIEL was intercepted discussing his drug trafficking activities with CRUZ. Throughout the course of this investigation, the Honorable Marianne B. Bowler has signed numerous warrants authorizing the government to obtain precise location information about the Target Telephones and other phones used by Target Subjects, to use a cell-site simulator device, and to install GPS devices on vehicles used by the Target Subjects.

## PROBABLE CAUSE

### A.  INTERCEPTED COMMUNICATIONS

20.     All of the intercepted communications detailed below have been summarized, but in many cases not yet been fully transcribed. The quotations from intercepted calls below are derived from summaries and/or preliminary transcripts. Many of the conversations are in Spanish and were translated by Spanish-speaking contract personnel to summaries and/or preliminary transcripts. Some of the pertinent conversations also include coded, cryptic, and/or slang language. For each of the calls discussed below, my interpretation of code words or other terminology, as well as my interpretations of the general substance of the calls, are based on my familiarity with this investigation and my training and experience.

<u>July 15, 2020: CRUZ discussed supplying SURIEL with drugs and payment</u>

21.     On July 15, 2020, at 3:50 p.m., SURIEL, using (978) 902-7946, called CRUZ, who was using Target Telephone 1. During the call, CRUZ stated, "He [DEMONIO] gave your gift to some other little [expletive]." SURIEL exclaimed, "Damn… He got someone else?" CRUZ replied, "Oh. No, no. The little [expletive] from Lowell, right? He ran out." SURIEL asked, "So what now?" CRUZ answered, "I'll be in Lawrence. Yeah, I'll be in Lawrence like in an hour, an hour and a half, alright?" SURIEL stated, "So, then you call me?" CRUZ answered, "I'll bring you that money and the food (slang meaning, drugs), 'cause where it's at, DEMONIO got no access to go inside." SURIEL asked, "Oh, alright. No, but I'm saying, the food you're gonna bring it for work, right? To work (slang meaning, drugs for resale)." CRUZ answered, "Yeah, to work. But, I'll bring you your money too." SURIEL acknowledged, "Alright, that's fine. Yeah, so you're gonna bring the work, to work [unintelligible] and bring my money. Alright." Based on the investigation, I believe that PEREZ SOTO provided a drug package meant for SURIEL to another drug courier in Lowell ("He [DEMONIO] gave your gift (slang meaning, drug package) to some other little [expletive]. The little [expletive] from Lowell"). I further believe CRUZ was planning to meet SURIEL to provide him with a drug package and his payment for selling drugs (CRUZ: "I'll bring you that money and the food (slang meaning, drugs)." SURIEL: "Yeah, so you're gonna bring the work (slang meaning, drugs to sell), to work [unintelligible] and bring my money."). Based on the investigation and speaking with members of the FLACO DTO, I know that a "gift" is a package of fentanyl packaged in various quantities that total approximately 140 grams.

22.     On July 21, 2020, at 10:44 p.m., CRUZ, using Target Telephone 1, called SURIEL. CRUZ asked, "How much food you got left?" SURIEL questioned, "How much food?" CRUZ clarified, "Yeah, so I could go bring you one. So when I go pick up the tickets (slang meaning,

money), you get your food." SURIEL questioned again, "So you could go what? Bring me food? I only got…" CRUZ interrupted, "So when I go…" SURIEL interrupted, "Yeah. I only got like f***ing… he only got like… how much smalls, like three? F***ing yeah. I think I got like three smalls (slang meaning, one-gram bags of drugs)." CRUZ replied, "Oh, okay. No, since I didn't see you yesterday. So I could go today, 'cause he told me you did a big play (slang, meaning drug deal)." SURIEL answered, "Yeah, I got all the money here. You can come and count it whatever. Right here. Yeah, but what? You're gonna bring me more food? 'Cause I'm low on food." CRUZ answered, "Yeah, that's what I'm saying. That way when I go pick that up, I bring you food." SURIEL answered, "Yeah. Do it like that smooth. Yeah, bring me food right now 'cause tell him he knows himself it's only like three or four smalls. So bring me the food and come pick up all the money. Yesterday's and then… remember I took my 4-70 yesterday, so there's still bread from yesterday and then today's bread." Based on the investigation, I believe that CRUZ arranged to resupply SURIEL with drugs and retrieve money from him ("So when I go pick up the tickets, you get your food.") I further believe that SURIEL did a large drug deal the day prior, had the proceeds from that sale, and was low on drug supply (CRUZ: "So I could go today, 'cause he told me you did a big play." SURIEL: "Yeah, I got all the money here. You can come and count it whatever. Right here. Yeah, but what? You're gonna bring me more food? 'Cause I'm low on food.").

<u>August 21, 2020: CRUZ discussed a drug resupply with INFANTE</u>

23.     On August 21, 2020, at 9:12 p.m., INFANTE, using (978) 764-8150, called CRUZ, who was using Target Telephone 2. CRUZ stated, "The driver that's dropping that off is going to call you." INFANTE replied, "Damn! I thought you were going to drop that off for me." CRUZ stated, "Is not me my [expletive]. You know I don't carry that sh** around." INFANTE acknowledged, "Alright." CRUZ stated, "He's gonna drop that off to you." INFANTE clarified,

"So you told him at the liquor store, right? To meet me at the liquor store." CRUZ acknowledged, "Yes, he's gonna call you when he's turning on Annis Street… to let you know that he's there." Based upon the investigation, I believe that CRUZ discussed resupplying INFANTE with drugs ("The driver that's dropping that off is going to call you."). I further believe that CRUZ told INFANTE that she did not carry drugs with her ("Is not me my [expletive]. You know I don't carry that sh** around.").

<u>August 21, 2020: CRUZ arranged to collect drug proceeds from INFANTE</u>

24.     On August 21, 2020, at 10:13 p.m., CRUZ, using Target Telephone 2, called INFANTE. INFANTE asked, "What's up?" CRUZ replied, "You want to meet me?" INFANTE stated, "Um… I went to a f***ing party, a get together." CRUZ then stated, "Where you at? Because I need the $4,000. This [expletive] has been harassing me for a while." INFANTE replied, "You need it right now?" CRUZ confirmed, "Yea, I need to get it right now." INFANTE stated, "You should have told me this since the beginning." CRUZ replied, "What you mean beginning? You know you gotta hand me that money every night. Before the end of the night. Especially when he does a *tableta* (Spanish meaning, tablet)." I believe that CRUZ attempted to collect $4,000 of drug proceeds from INFANTE ("Where you at? Because I need the $4,000. This [expletive] has been harassing me for a while."). I further believe that a *tableta* refers to drug package and that CRUZ reminded INFANTE that he needed to provide the day's drug proceeds every night, especially after receiving a drug package ("What you mean beginning? You know you gotta hand me that money every night. Before the end of the night. Especially when he does a *tableta*.").

<u>August 22, 2020: CRUZ explained the payment of drug couriers to SURIEL</u>

25.     On August 22, 2020, at 1:20 p.m., CRUZ, using Target Telephone 2, called INFANTE. INFANTE stated, "Why? I can't take it right now? Cause I'm not gonna stick around

later." CRUZ interrupted, "You can't take it now. No… because they expecting that money. Like… I already got the other part of it. You know? If you would've done this last night, I would've probably seen you today early with the money. But I don't got no more money on me, and they expecting that amount, plus whatever the f*** I got here. I gotta go hand $4,800, and you got there complete what I got. But I got you! Like… last time I brought it to you. You know what I mean? It's not like… I'm not gonna give it to you." Based on this investigation, I believe that INFANTE was expecting to be paid from the drug proceeds that he owed the FLACO DTO ("Why? I can't take it right now? Cause I'm not gonna stick around later."). I further believe that CRUZ told INFANTE that he could not keep his pay from the drug proceeds because she needed the full amount ("You can't take it now. No… because they expecting that money."). I further believe that if INFANTE provided the drug proceeds on time, as discussed above, CRUZ would have paid him on August 22, 2020 ("If you would've done this last night, I would've probably see you today early with the money.").

26.     On August 22, 2020, at 1:23 p.m., SURIEL, using (978) 902-7946, called CRUZ, who was using Target Telephone 2. CRUZ stated, "Listen, NATI can't be asking for money that he didn't work for all week. He's just some guy with a *tableta*. Whenever he sees somebody he gets $200. He's [unintelligible] something because when he does little plays." SURIEL replied, "No, no. He's just asking for my money. You heard?" SURIEL later stated, "No. You're getting confused. You heard? He's getting the 400, that's on my pay. Out of my $1,000." CRUZ replied, "Alright, but that's on your pay. So I gotta give you 800 because he's two with the 200." SURIEL stated, "Whatever he took out of my 800 pay, NATI gets 400. Alright? He gets 400." CRUZ answered, "You gotta give him 200." SURIEL stated, "Alright. You gave him 200?" CRUZ replied, "So, I'm going to give you 820, right? Cause with the 180 he took… that completes the

1,000." SURIEL acknowledged, "Alright." Based on the investigation, I believe that SURIEL and INFANTE worked together as drug couriers for the FLACO DTO, and that SURIEL managed INFANTE's drug distribution activities. I further believe that SURIEL clarified with CRUZ that INFANTE should be paid from the $1,000 that is owed to SURIEL from the FLACO DTO. ("No. You're getting confused. You heard? He's getting the 400, that's on my pay. Out of my $1,000.") I further believe that CRUZ clarified that SURIEL would be paid $820 because INFANTE already took $180 ("So, I'm going to give you 820, right? Cause with the 180 he took… that completes the 1,000.").

September 26, 2020: INFANTE and CRUZ dispute over drug proceeds

27.     On September 26, 2020, at 2:05 p.m., INFANTE, using (978) 376-8398, called CRUZ, who was using Target Telephone 2. CRUZ asked, "How much money you gave the driver yesterday?" INFANTE answered, "Like 2,000 something bucks." CRUZ asked, "You got work left, right?" INFANTE replied, "F***ing… I don't have no more work left." CRUZ replied, "So, how the f*** you got no more work left? 'Cause you haven't gave no money and then…" INFANTE interrupted, "I gave the money yesterday, the taxi." CRUZ stated, "Yeah, yesterday, that pack yesterday, you got the pack yesterday. That is supposed to be 4,000 dollars." INFANTE replied, "Yeah, but the thing is people got front and sh**, and then people came with 120…" CRUZ interrupted, "There's no way he's gonna front $2,100. Let me call him because I don't know." Based on the investigation, I believe that CRUZ expected INFANTE to provide $4,000 of drug proceeds ("You got the pack (slang meaning, drug package) yesterday. That is supposed to be 4,000 dollars."). I further believe that INFANTE only provided CRUZ with $2,000 through one of her drivers (CRUZ: "How much money you gave the driver yesterday?" INFANTE: "Like 2,000 something bucks."). I believe that INFANTE was trying to explain that he provided $2,000 worth

of drugs to a customer on credit, which was an unacceptable explanation to CRUZ. (INFANTE: "Yeah, but the thing is people got front and sh**, and then people came with 120…" CRUZ: "There's no way he's gonna front $2,100.").

28.     On the same day, at 3:37 p.m., SURIEL called CRUZ, who was using Target Telephone 2. CRUZ stated, "Listen, if you're waiting for your pay I just talked to this n**** (meaning, DIAZ) and he said to talk to NATI. Because NATI only has the $2,000 and there's $2,100 missing,. He said he got rid of the whole gift. So if he got rid of the whole gift, where's the rest of the money?" SURIEL acknowledged. CRUZ continued, "I just told him that NATI said he talked to him. He said he didn't talk to him. That there's no way he fronted $2,000." SURIEL replied, "You know how I'm going to do it now? When you guys bring the gift. I'm going to have it like this. The n****s, every play they do, they got to bring me the money." I believe that CRUZ called SURIEL to complain about the $2,100 of missing drug proceeds from INFANTE ("NATI only has the $2,000 and there's $2,100 missing. He said he got rid of the whole gift. So if he got rid of the whole gift, where's the rest of the money?"). I believe that SURIEL stated that he would monitor drug couriers more closely in the future and that they would have to provide him (SURIEL) with the proceeds after each drug deal ("You know how I'm going to do it now? When you guys bring the gift. I'm going to have it like this. The n****s, every play they do, they got to bring me the money.").

29.     On the same day, at 3:44 p.m., INFANTE called CRUZ, who was using Target Telephone 2. CRUZ stated, "There's $1,000 missing." INFANTE stated, "So what? So now you guys not going to pay us?" CRUZ stated, "No. No. You're missing. No, 'you guys?' I work just like you, so don't come at me. My job is to pick up money." Based on the investigation, I believe that INFANTE owed CRUZ $1,000 ("There's $1,000 missing"). I further believe that INFANTE

was accusing CRUZ of not paying him and/or SURIEL because of the missing money ("So what? So now you guys not going to pay us?").

30.     On the same day, at 4:20 p.m., SURIEL called CRUZ, who was using Target Telephone 2. SURIEL stated, "Listen, I already talked to NATI. NATI is going to work for free." CRUZ replied, " And he wanted to come and flip out on me because I told him off… 'Cause I did not front 2,100…" SURIEL stated, "That's why I told him…" CRUZ stated, "So he's (meaning INFANTE) going to eat that." I believe that SURIEL spoke to INFANTE and had INFANTE agree to work for free for the FLACO DTO until $2,100 were re-paid. I believe that this series of intercepted calls demonstrated that CRUZ managed SURIEL and SURIEL managed INFANTE.

<u>September 27, 2020: SURIEL asked CRUZ to be resupplied with drugs</u>

31.     On September 27, 2020, at 1:36 p.m., SURIEL called CRUZ, who was using Target Telephone 2. SURIEL asked, "Is there work today?" CRUZ answered, "I don't know 'cause the guy was supposed to see DEMONIO yesterday and he didn't see him. So, as soon as the guy sees DEMONIO, DEMONIO could go see you. DEMONIO got no food to give you so you gotta wait." SURIEL replied, "Oh, I gotta wait for the food to finish." CRUZ stated, "I got you. As soon as that [expletive] sees DEMONIO, I'll call you." Based on the investigation, I believe that SURIEL asked CRUZ if there were drugs to sell ("Is there work today?"). I believe that CRUZ was waiting for a drug supplier to see DEMONIO before she could resupply SURIEL ("I don't know 'cause the guy was supposed to see DEMONIO yesterday and he didn't see him. So, as soon as the guy sees DEMONIO, DEMONIO could go see you. DEMONIO got no food to give you so you gotta wait.").

<u>December 9, 2020: CRUZ planned to resupply SURIEL with drugs</u>

32.     On December 9, 2020, at 3:08 p.m., SURIEL called CRUZ, who was using Target

Telephone 9. CRUZ stated, "Coming from the gift right now. So you can go. Ossipee. I'll see

you right there and then." SURIEL asked, "What happened?" CRUZ replied, "I'm going for your

gift right now. So that way… Two birds with one stone." SURIEL stated, "Okay. So who's at

DEMONIO's. You want me to give the money to him or…?" CRUZ interrupted, "No. No. I'm

going to go to you. But I'm telling you I'm going to call for your gift so that… Be getting there

also the same time as me." SURIEL asked, "Oh. You said the gift should be getting there the

same time as you?" CRUZ stated, "Your new food. Yeah. You don't want food?" SURIEL

stated, "No. Yeah. I just got confused. I'm like… Oh. I thought you were saying that you're

going to bring food and then the money. But you saying this n**** is going to pull up here at the

same time as you." CRUZ stated, "No. I'm going to call for the food. I don't know where

DEMONIO is at. But DEMONIO is always shorting sh**. You feel me? So somebody else…"

SURIEL interrupted, "You heard? The smalls and the fives (slang meaning, five-gram quantities

of drugs). CRUZ stated, "Yeah. I know." I believe that CRUZ was planning to meet SURIEL to

supply him with a drug package ("I'm going for your gift right now."). I believe that SURIEL

asked CRUZ if he should provide his drug proceeds to PEREZ SOTO ("Okay. So who's at

DEMONIO's. You want me to give the money to him or…?"). I believe that CRUZ stated she

arranged for someone else to meet her with SURIEL's drug package (I'm going to call for the

food."). I believe that CRUZ requested someone else to bring SURIEL's drug package because

PEREZ SOTO was frequently making the one-gram bags and five-gram bags of drugs lighter

than advertised (CRUZ: "DEMONIO is always shorting sh**." SURIEL: "The smalls and the

fives.").

## B.  CONTROLLED PURCHASES

33.     In July 2020, in an unrelated investigation and independent of this DEA investigation, a Massachusetts State Police ("MSP") Trooper acting in an undercover capacity ("MSP-1"), utilized a Snapchat social media account to advertise the sale of marijuana to the general public. MSP-1 is assigned to investigate gang and firearm offenses in the Lawrence area. On August 1, 2020, SURIEL, using the Snapchat account "Cali Plugg," sent MSP-1 a phone number (978) 935-2254 and stated, "[H]it me up," which MSP-1 understood to mean that SURIEL was soliciting marijuana. Snapchat is a social media platform that does not preserve communications and erases communications upon a user viewing them. On August 1, 2020, MSP-1 forwarded the phone number to another MSP Trooper acting in an undercover capacity ("MSP-2") to further the investigation.

34.     In a ruse, MSP-2 explained to SURIEL that he could not sell marijuana to SURIEL, but instead requested cocaine or MDMA, a/k/a "X," from SURIEL. On August 1, 2020, MSP-2 sent a text message to (978) 935-2254 stating, "u fk with white to or jus bud?" The user of (978) 935-2254 replied, "This is his girl. Text his #." The user of (978) 935-2254 then provided SURIEL's telephone number (978) 902-7946, the same telephone SURIEL used to communicate with CRUZ.

35.     On August 1, 2020, MSP-2 exchanged a series of text messages with SURIEL. MSP-2 asked, "[U] fk with white to or just bud?" SURIEL responded, "White and bus wtw (an acronym meaning, "what the what," slang for "what's up")." The UC replied, "[M]y guy is out for the week bruh… cn I hit u this week." Based on my training and experience, I believe that MSP-2 asked SURIEL if he dealt with cocaine or only marijuana ("[U] fk with white to or just bud?"). MSP-2 also asked if he could see SURIEL that week because MSP-2's fictitious supplier was

unavailable ("[M]y guy is out for the week bruh… cn I hit u this week."). I believe that SURIEL responded that he dealt with cocaine and marijuana ("White and bus (I believe a typo for "bud")). MSP-2 later asked, "[U] fk wit breezy (slang meaning, fentanyl)." SURIEL later replied, "Wanna do business." I believe that SURIEL was interested in selling drugs to MSP-2. These text messages are preserved. Thereafter, MSP conducted several undercover purchases of suspected fentanyl from SURIEL. A representative undercover purchase involving the Target Location is detailed below.

<u>September 2, 2020: SURIEL's drug courier left the Target Location prior to an undercover purchase of fentanyl and returned to the Target Location after the sale</u>

36.     On September 2, 2020, at 10:45 a.m., MSP-2 contacted SURIEL, who was using (978) 902-7946, and arranged to purchase 30 grams of fentanyl for $500 in a text message and unrecorded phone call. In the text message, the MSP-2 stated, "[W]tw (meaning, what the what, or what's up)". During a subsequent unrecorded phone call, SURIEL and MSP-2 arranged the purchase of 30 grams of fentanyl for $500, and SURIEL advised MSP-2 to go to 393 Chestnut Street. This undercover purchase was part of an MSP investigation, which did not utilize consensual audio recordings. SURIEL advised MSP-2 not to park directly in front of the address.

37.     After the call, MSP-2 was provided $500 of recorded funds and a video recording and surveillance device. MSP-2 then travelled to 393 Chestnut Street and called SURIEL. SURIEL advised that his cousin was on his way. I believe that SURIEL intended to send a courier to deliver the drugs to MSP-2.

38.     At 12:15 p.m., investigators observed SURIEL exit the Target Location and then go back inside. Shortly thereafter, investigators observed a drug courier exit the Target Location and walk towards Chestnut Street. Investigators observed the courier using a cellular telephone while appearing to be looking for MSP-2's vehicle. Investigators then observed the courier

approach and enter the front passenger seat of MSP-2's vehicle. Inside the vehicle, the courier removed a twisted plastic bag containing a tan powdery substance from his groin area and provided it to MSP-2 in exchange for the recorded funds. The courier then exited MSP-2's vehicle and walked down Elm Street towards the Target Location. MSP-2 then left the area and drove to a predetermined meeting location, where he handed the suspected fentanyl to investigators. Based on my training and experience, knowledge of the investigation, and conversation with investigators who observed the substance and its packaging, I believe that MSP-2 received a package of fentanyl from the courier. The suspected fentanyl was packaged and transported to the MSP Crime Laboratory for further analysis, which remains pending. The suspected fentanyl was not field tested.

39.     After the deal was completed, at 12:25 p.m., investigators observed the courier arrive outside the Target Location. Investigators then observed the courier and SURIEL enter a vehicle. Inside the vehicle, an investigator observed the courier hand cash to SURIEL. Thereafter, surveillance was terminated.

### SURIEL's continued use of the Target Location

40.     Following the arrest of CRUZ on December 16, 2020, I learned from toll analysis records that SURIEL discontinued his use of (978) 902-7946. On May 8, 2020, MSP-2 received a call from SURIEL, who was using (978) 872-5172. This call was not recorded. MSP-2 did not recognize the telephone number, but SURIEL identified himself as "Chachi," who MSP-2 knew as SURIEL. SURIEL told MSP-2 that (978) 872-5172 was his new telephone number. SURIEL asked if MSP-2 was still "around" because he had not seen MSP-2 in a long while. In a ruse, MSP-2 stated that he was selling "sticks," meaning 10-gram quantities of fentanyl, but getting his drugs

from another drug dealer. Thereafter, SURIEL solicited MSP-2 to call him if he needed anything, meaning drugs. MSP-2 told SURIEL that he would call him later.

41.     On May 12, 2021, at 2:30 p.m., MSP-2 contacted SURIEL, who was using (978) 872-5172, and arranged to purchase 50 grams of fentanyl for $1,000 in an unrecorded phone call. During the phone call, MSP-2 informed SURIEL that he had a "band," slang meaning $1,000. SURIEL agreed to provide MSP-2 "50 grams" and that he would provide an additional 10 grams at a later date. Based on my training and experience, $1,000 is the street value of 50 grams of fentanyl in Lawrence. Thereafter, SURIEL instructed MSP-2, "Meet me at my crib (slang meaning, my house)," and then provided MSP-2 the address, "22 Chardon Street," which is the Target Location. SURIEL also instructed MSP-2 not to park directly in front of the address.

42.     After the call, MSP-2 was provided $1,000 of recorded funds and an audio and video recording and surveillance device. Based on this federal investigation, MSP was instructed to make a consensual recording of the personal meeting with SURIEL. MSP-2 then travelled to the area of the Target Location, parked, and walked to the front porch of the Target Location. Based on my experience with conducting a prior search warrant at the Target Location, I know that the front porch only accesses the Target Location and not the second floor. SURIEL advised MSP-2 that his source was late. SURIEL then directed an unidentified male ("UM") to go with MSP-2 to meet his source at 44 Pleasant Street in Lawrence. During this meeting, SURIEL also discussed the quality and prices of drugs with MSP-2 and advised MSP-2 that he would always make money when buying drugs from SURIEL. This meeting was audio and video recorded and clearly depicted SURIEL.

43.     After speaking with SURIEL on the porch of the Target Location, UM and MSP-2 entered MSP-2's vehicle and travelled to 44 Pleasant Street in Lawrence. Upon arrival, UM went

inside 44 Pleasant Street for a moment and then returned into MSP-2's vehicle. Inside the vehicle, UM provided MSP-2 with a plastic bag containing a tan powdery substance in exchange for the recorded funds. UM then exited MSP-2's vehicle and returned into 44 Pleasant Street. MSP-2 then left the area and drove to a predetermined meeting location where he handed the suspected fentanyl to investigators. Based on my training and experience, knowledge of the investigation, and conversation with investigators who observed the substance and its packaging, I believe that MSP-2 received a package of fentanyl from UM at the direction of SURIEL. The suspected fentanyl was packaged and transported to the MSP Crime Laboratory for further analysis, which remains pending. The suspected fentanyl was not field tested.

44.     Approximately 20 minutes after MSP-2 left the area, investigators observed UM return to and enter the Target Location. Thereafter, surveillance was terminated.

**Drug Traffickers' Use of Residences, Vehicles, and Cell Phones Generally**

45.     Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences or stash locations, quantities of illicit drugs to maintain their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils, at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.

46.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

47.     Even when drug dealers store their drugs outside their residence, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

48.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection

with drug trafficking are often kept in their residences. Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

49.     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones are kept at their residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

50.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

51.     Finally, as noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and

information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

52.     It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones can often be evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

53.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

54.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted,

they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

55.    I have participated in the execution of numerous search warrants at the residences of drug traffickers similar to the Target Location. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related evidence typically have been recovered in both conventional and electronic formats:

      a.  controlled substances;

      b.  paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and

mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

c.  books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

d.  personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

e.  cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f.  documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g.  cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h.  firearms and other dangerous weapons; and

i.  identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

56.   Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that SURIEL has engaged in the Target Offenses.  I believe that SURIEL resides at the Target Location, and that evidence of SURIEL's drug trafficking offenses will be found inside the Target Location and on certain cellular telephones seized therefrom.

## CONCLUSION

57.     Based on the information set forth above, I believe probable cause exists to conclude that SURIEL has committed the Target Offenses and that evidence of the Target Offenses, as set forth in Attachment B will be found inside the Target Location set forth in Attachment A. Further, I submit there is probable cause to believe that no later than July 15, 2020 continuing until at least on or about May 12, 2021, Justin SURIEL conspired to distribute and possess with intent to distribute fentanyl, in violation of 21 U.S.C. § 846.

58.     Because the search warrant, arrest warrant, complaint, accompanying affidavit, and applications in support thereof reveal an ongoing investigation, it is further requested that the warrants, complaint, accompanying affidavit, and application be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against the flight of fugitives, and better ensure the safety of agents and others, except that copies of the warrants and complaint in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents, Task Force Officers, and other investigative and law enforcement officers of the DEA, federally deputized state and local law enforcement officers, and other government agents and contract personnel acting under the supervision of such investigative law enforcement officers, as necessary to effectuate the warrants.

/

/

/

/

/

59.     I, James Keczkemethy, having signed this affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

/s/ James Keczkemethy

_____
James Keczkemethy
Special Agent
Drug Enforcement Administration

Attested and sworn to telephonically in accordance with Fed. R. Crim. P. 4.1 on May 19, 2021.

HON. MARIANNE B. BOWLER
United States Magistrate Judge

## ATTACHMENT A

### (Target Location to be searched)

22 Chardon Street, First Floor, Lawrence, Massachusetts is the first floor of a two-family, two-story, residence.  The residence is covered in tan siding with white trim. The first-floor unit is accessed via a shared main entrance at the back of the home with a white door, and then a private entrance once inside the main door. There is also a front entrance, with a porch, that is used only by the first-floor unit. The Target Location includes all common areas of the building, including the basement. A photograph of the residence is attached.



**ATTACHMENT B**

**(Items to be seized)**

All records, from January 2020 to present, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses"):

1. Any books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

3. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Any documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

5. Any items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal

telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

6.      Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

7.      Cellular telephones, computers, and other electronic storage media, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including but not limited to:

  a.      Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

  b.      Any logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

  c.      Any text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

  d.      Any information involving the travel to obtain controlled substances or the transportation of controlled substances

  e.      Any incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

  f.      Any GPS data;

  g.      Any browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

  h.      Any documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

i.      All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

j.      Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.